UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| ASHLEY MARTIN, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-0557-JRS-MPB |
| | ) | |
| JUSTUS AT WOODLAND TERRACE LLC | ) | |
| D/B/A WOODLAND TERRACE OF | ) | |
| CARMEL, | ) | |
| | ) | |
| Defendant. | ) | |

**Order on Motion for Summary Judgment**

Ashley Martin, an African American, sued Justus at Woodland Terrace LLC d/b/a Woodland Terrace of Carmel ("Woodland Terrace"), alleging that it fired her because of her race in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a) *et seq.*, and 42 U.S.C. § 1981. Woodland Terrace moves for summary judgment. (ECF No. 62.) Because no reasonable jury could find that Martin was discharged because of her race, summary judgment should be **granted**.

I.  **Background**

Ashley Martin was hired as a Licensed Practical Nurse ("LPN") for Woodland Terrace in February 2017. (Martin Dep. 13, ECF No. 63-3.) She had an orientation period for about one month and began working there in April that year. (*Id.*) She worked a full-time schedule and was assigned to the night shift, which was 7:00 p.m. to 7:00 a.m. (*Id.* at 13–14) Martin was required to work three days per week, and sometimes worked more than that minimum requirement. (Martin Dep. 14, ECF No.

63-3.) Her job description stated that she was responsible for supervising the nursing activities in her designated area during her assigned tour of duty. Resident assistants (Certified Nursing Assistant ("CNA")) in that area reported to her. (Martin Dep., Ex C, ECF No. 63-3 at 69.) Martin's major responsibilities included health services team leadership and resident care such as making regular rounds of her assigned work area, supervising the care of residents in her area, caring for residents, and delegating responsibility to resident assistants. (*Id.*) While employed with Woodland Terrace, Martin was also working at other assistive living communities. (Martin Dep. 10–12, 14, ECF No. 63-3.)

The Woodland Terrace Company Associate Handbook identified company policies, including an associate's duty to conduct herself in a professional manner that is in the residents' best interest. (Martin Dep. Ex. C, ECF No. 63-3.) The handbook identified reasons for disciplinary action, including unsatisfactory job performance and unauthorized leaving of work or work areas prior to the end of a scheduled shift. (*Id.*, ECF No. 63-3 at 86.) In late February and early March 2017, Martin signed for and acknowledged receipt of the LNA job description and the company associate handbook. (Martin Dep., Ex D, ECF No. 63-3.) Martin agreed that the residents on the Memory Care Unit, who suffer from dementia and other memory issues, needed assistance caring for themselves. (Martin Dep. 19, ECF No. 63-3 (stating that "[t]hey're high volume.").)

On July 18 to July 19, 2017, Martin was working the night shift at Woodland Terrace. (Martin Dep. 18, ECF No. 63-3.) She was assigned to the Memory Care

Unit. (*Id.*) Woodland Terrace has security cameras; the cameras show some of Martin's actions that evening. (Martin Dep. 53–54, 58–59, ECF No. 63-3.)[1] At 1:08 a.m., Martin entered the model unit (a sample unit that prospective residents could view). At 5:08 a.m., she exited the model unit. (*Id.*) Martin testified that she "probably" went "in and out, in and out" of the model unit during that four hours (Martin Dep. 54, ECF No. 63-3); however, Martin's appearance on the video at 5:08 a.m. was the first visual of her since the beginning of that four-hour period. (Stites Dep. 146, ECF No. 63-1.) Woodland Terrace's Health Services Director Diane Kohan testified that staff was not authorized to be in the model unit. (Kohan Dep. 58, ECF No. 72-1.)

Meanwhile, security camera footage showed that the overnight concierge entered the Memory Care Unit at 1:49 a.m., walked by the nurse's station, and encountered a female resident walking around by herself unattended. (Stites Dep. 133–34, ECF No. 63-1.) The concierge looked around the nurse's station, the dining room, the model unit, and the hallway and could not find a nursing staff member (*Id.* at 134–35.) The concierge walked by the model unit three times but still could not locate a staff member. (*Id.* at 136.) Having been unable to locate a nursing staff member, the concierge went up to the second floor to get Cynthia Coleman, the other nurse on site at the time, and found her in the Life Enrichment Center (essentially a break room with microwave, refrigerator, sofa, T.V., etc.). (Stites Dep. 136–37, ECF No. 63-1.) The concierge later reported to Woodland Terrace Executive Director Cole Stites that the other CNA staff were also in the Life Enrichment Center cutting Hawa Mengoua's

---

[1] At her deposition, Martin identified herself in the still photographs taken from the security camera video footage. (Martin Dep. 48, ECF No. 63-3.)

3

hair. (Stites Dep. 137, ECF No. 63-1.) Coleman went with the concierge to the Memory Care Unit to assist the resident. (Stites Dep. 137–38, ECF No. 63-1.) After assisting the resident, Coleman left the Memory Care Unit unattended and with the unit keys. (Stites Dep. 138, ECF No. 63-1.) Video from the Memory Care Unit showed that no one appeared on the unit from 2:34 a.m. until 2:57 a.m. (Stites Dep. 139, ECF No. 63-1.)

At 4:57 a.m., an orientee (staff in training) went onto the Memory Care Unit to respond to a call light and assist a resident. (Stites Dep. 145, ECF No. 63-1.) All nurses carry pagers that would have been activated by the call light; the other nurses were either not carrying their pagers or not responding to them. (Stites Dep. 146, ECF No. 63-1.) At 5:07 a.m., the orientee again answered a call light on the Memory Care Unit for the same resident needing assistance. (Stites Dep. 146, ECF No. 63-1.) Executive Director Stites testified that it was not appropriate to leave the orientee in charge of the Memory Care Unit without a regular employee there to provide supervision. (Stites Dep. 8, 145, ECF No. 63-1.) Martin did not respond to either call light. (*See* Stites Dep. 146, ECF No. 63-1.)

At 5:10 a.m., Martin walked up and down the hallway for less than two minutes and then returned to the model unit. (Stites Dep. 146–47, ECF No. 63-1.) Director Stites's review of the video did not show anything significant happening on the Memory Care Unit between 5:10 a.m. and 6:10 a.m. (Stites Dep. 147, ECF No. 63-1.) Based on his review of the video, Director Stites concluded that no one was on the Memory Care Unit during that time period. (*Id.*) At 6:10 a.m., nurse Cynthia

4

Coleman went into the model unit to get Martin. (Stites Dep. 147, ECF No. 63-1.) At 6:12 a.m., Martin left the model unit. (*Id.*) Director Kohan testified that the camera showed no activity on the Memory Care Unit "for a very extended period of time." (Kohan Dep. 58, ECF No. 72-1.) At her deposition, Martin recalled that at one point that evening, Coleman had retrieved the keys from her in order to assist a resident. (Martin Dep. 54, ECF No. 63-3; *see also* Stites Dep. 132–33, ECF No. 63-1.) According to Director Stites, this transfer of keys signaled that Martin was not working and was "off duty." (Stites Dep. 132–34, ECF No. 63-1.)

Martin was scheduled to work the night shift again on July 19 to 20, 2017. When she reported to work, she was directed to the conference room. After all the staff from the night shift the night before—Martin, Coleman, Johnson, Hawa Mengoua, and an aid named Brittany—were gathered, Executive Director Stites and Health Services Director Kohan entered the conference room. Sites asked the staff if there was anything to report from the night before. (Def.'s Answer to Pl.'s Interrog. No. 6, ECF No. 63-4.) Martin said that she had been on the Memory Care Unit the entire night. (*Id.*) She had no explanation as to why the concierge could not locate her on the unit and had to go to the second floor to find a staff member to assist a resident. (*Id.*) Coleman had no explanation for why she would have to go assist a resident on the Memory Care Unit if Martin was on the unit. (*Id.*) No one gave Stites and Kohan any explanation about what had happened the night shift before. Stites announced that all five employees were fired. (*Id.*)

5

Woodland Terrace explains that it terminated Martin's employment for abandonment of residents and her job duties on the Memory Care Unit. (Stites Dep. 71–74, ECF No. 63-1.) When Stites and Kohan were reviewing the videos of the night shift and deciding what action to take, the issue of race was never discussed. (Stites Dep. 152, ECF No. 63-1.) In deciding to discharge the nursing staff, Stites and Kohan considered the nurses' job duties and abandonment of their assigned areas. (Stites Dep. 152–53, ECF No. 63-1.)

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, a court views the facts and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255.

## III. Discussion

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). In deciding whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused her discharge courts consider the evidence "as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Nonetheless, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

remains a useful tool for presenting and assessing the evidence in discrimination cases. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). The parties have used this framework, and the Court uses it as well. *See id.*

Under the *McDonnell Douglas* framework, a plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) her employer took an adverse employment action against her; and (4) a similarly situated employee outside the protected class was treated more favorably. *See Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019); *Johnson*, 892 F.3d at 894–95. If the plaintiff makes this showing, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). The same standard is applied to discrimination claims under § 1981. *Fields*, 928 F.3d at 625.

Martin cannot show that she was meeting Woodland Terrace's legitimate expectations or that a similarly situated employee outside the protected class was treated more favorably than she. Therefore, Woodland Terrace is entitled to summary judgment on her race discrimination claims.

Coming to work and actually working, like following an employer's policies, are basic employment requirements and legitimate expectations of the employer. *See, e.g., Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001) (stating that

7

attendance and adherence to company policies are legitimate expectations); *Evans v. Patrick Alum., Inc.*, 4:16-cv-00160-TWP-DML, 2018 WL 2445544, at *6 (S.D. Ind. May 30, 2018) ("Where an employee is responsible for knowing policy and fails to comply with it, the employee cannot be said to be meeting his or her employer's legitimate expectations."). As a corollary, an employee who abandons her job cannot show that she was meeting her employer's legitimate expectations. *See Stodola v. Finley & Co.*, No. 2:05–CV–464–PRC, 2008 WL 3992237, at *14 (N.D. Ind. Aug. 21, 2008).

Video of the Memory Care Unit shows Martin entering the model unit at 1:08 a.m.; she does not emerge until 5:08 a.m., four hours later. (Martin Dep. 53–56, ECF No. 63-3.) She walked the unit for less than two minutes and then returned to the model until for another hour until nurse Coleman retrieved her. Director Kohan testified that the model unit on the Memory Care Unit was not authorized for staff (Kohan Dep. 58, ECF No. 72-1), and her testimony remains unrefuted. Further, the evidence establishes that nurse Coleman, who was not assigned to the Memory Care Unit that shift, had retrieved the keys from Martin, which signaled that Martin was not using the keys herself and was "off duty." (Martin Dep. 54, ECF No. 63-3.) Just before 2 a.m., the concierge encountered a resident walking the Memory Care Unit hallway unattended. When he could not find Martin or any other nursing staff, he got Coleman to come down from the second floor to assist the resident. Director Kohan testified that "no one" was on the Memory Care Unit, and the video footage reflected no activity for an extended period of time. (Kohan Dep. 58, ECF No. 72-1.) Moreover,

8

Martin's appearance on the video at 5:08 a.m. was the first visual of her for four hours. (Stites Dep. 146, ECF No. 63-1.)

Even if Martin was physically present on the Memory Care Unit, as she said, she was not attending to her job duties such as responding to pages for resident assistance or assisting residents. Two call lights were activated by a resident on the Memory Care Unit around 5 a.m., and Martin did not respond to either call light as her job duties required. Instead, an orientee responded to the call lights. Executive Director Stites testified that a regular employee should have been there to supervise the orientee. And it was Martin's responsibility to supervise the nursing activities in the Memory Care Unit during that shift. But she provided no such supervision for extended periods of time. Given this undisputed evidence, no reasonable jury could find that Martin was meeting Woodland Terrace's legitimate expectations.

In addition, Martin has presented insufficient evidence to allow a reasonable inference that a similarly situated employee outside the protected class was treated more favorably. Martin points to three employees who she maintains engaged in similar conduct but were not discharged: (1) the concierge, (2) the nurse who gave a resident the wrong medication causing the resident to have a reaction, and (3) the nurse who slept during her shift. Martin also argues that video from the Memory Care Unit the night after she was fired shows that no one was staffing the nursing station, yet no employees were terminated. "Similarly situated means 'directly comparable' in all material respects." *Johnson*, 892 F.3d at 895 (quoting *Reed v. Freedom Mortg.*, 869 F.3d 542, 549 (7th Cir. 2017)). In the usual case, a plaintiff must show

9

that the comparators: (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2013)).

Martin argues that the concierge is a permissible comparator because he violated the same general workplace rules by not staying in his designated work area or ensuring that the Memory Care Unit was staffed. But the concierge's job duties were not the same or even closely similar to Martin's duties as an LPN. The concierge's principal duty was not resident care, as it was for Martin. And Martin was discharged not just for violating a "general workplace rule," she was fired for abandoning her assigned area and duties for extended time periods. The concierge's conduct in leaving the front desk unattended for a brief time to track down a staff member to assist a resident on the Memory Care Unit is nothing comparable to the seriousness of Martin's misconduct in disappearing from the Memory Care Unit for four hours and then again for another hour. While the concierge left the Memory Care Unit unattended, attending to the residents on the unit was not his responsibility; that was Martin's responsibility. Nor was he expected to supervise the nursing activities in the Memory Care Unit; that was Martin's responsibility, too, and she provided no such supervision for extended periods of time. No reasonable jury could find that the concierge's alleged misconduct was comparable to Martin's misconduct.

Martin argues that the nurse who gave a resident the wrong medication is a permissible comparator because that nurse caused actual harm. Martin asserts that she

10

was not accused of harming a resident or engaging in conduct that resulted in any actual harm. There are material differences in the nurse's mistake and Martin's misconduct. Most important, there is no suggestion that the nurse intentionally gave the resident the wrong medication, whereas Martin knowingly disappeared from her assigned area and duties first for four hours and then again for another hour during her shift. And like the nurse that gave the wrong medication, there is no evidence that the nurse who fell asleep on her shift did so intentionally. Nor is there evidence that she slept for extended time periods. Martin testified that the nurse in question "fell asleep" "a couple of times during her shift" in "multiple places," including "in her car." (Martin Dep. 44, ECF No. 64-3.) Without evidence that the nurse intentionally fell asleep or slept for extended time periods, her conduct is not sufficiently comparable to Martin's abandonment of her duties. No reasonable jury could find that any of these alleged comparators engaged in conduct of comparable seriousness as Martin's; thus, the different treatment does not raise a reasonable inference of race discrimination.

As for the video of the nurse's station on the Memory Care Unit the night of Martin's termination, the video shows that the nurse's station was not staffed at all times (Stites Dep. 175, ECF No. 55-1), but it does not show that the staff on duty left the Memory Care Unit unattended and abandoned their duties for extended periods of time. Martin acknowledges that the nursing staff was to make rounds and check on residents. And there is evidence that Martin did not do these tasks the night before she was terminated. She was nowhere to be seen on the Memory Care Unit for

11

extended periods of time. Coleman had to come down from the second floor to assist a patient; and an orientee came onto the unit to assist a patient on two occasions. Even if Martin was physically present on the unit, she did not respond to the pages or assist those residents. Martin has come forward with insufficient evidence from which a reasonable jury could find that her alleged comparators were similarly situated.

And even if Martin had enough evidence to permit a reasonable factfinder to conclude that similarly situated employees were treated more favorably, she has insufficient evidence to permit a finding that she was meeting Woodland Terrace's legitimate expectations. Therefore, Woodland Terrace is entitled to summary judgment on her race discrimination claims.

## Conclusion

Defendant's motion for summary judgment (ECF No. 62) is **granted**.

**SO ORDERED.**

Date: 12/31/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Tiffany Ruth Guthrie
STEWART & STEWART
Tiffany@getstewart.com

Robert M. Kelso
KIGHTLINGER & GRAY, LLP (Indianapolis)
rkelso@k-glaw.com

Darron S. Stewart
STEWART & STEWART
darron@getstewart.com

Megan Ann Van Pelt
KIGHTLINGER & GRAY LLP
mvanpelt@k-glaw.com